14 JUN 27 AM 9: 49

DEPUTY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SUSAN CARTER, as Class representative, on behalf of herself and of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br><br> THE COUNTY OF SAN DIEGO, a Government Entity; DEPARTMENT OF PROBATION OF SAN DIEGO; A Public Agency; and Does 1-20, Inclusive, <br><br> Defendants. | Case No.: <br> **'14 CV 1551 LAB KSC** <br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff, Susan Carter, on behalf of herself and of all persons similarly situated, all of whom represent the Class of Plaintiffs bringing this action and request for injunctive relief, alleges the following:

## INTRODUCTION

1. This is a time when our nation has come a long way in our recognition and protection of the Constitutional rights of all of our citizens to be free from discrimination, oppression, violence, and mistreatment at the hands of the government. It is unacceptable, therefore, that there is no such recognition and protection for the citizens who have been named as defendants in San Diego County criminal courts. In fact, the agents, employees, and other representatives of the County of San Diego believe they have a free pass to violate the Constitutional rights of persons involved in the criminal court system, and they take unrestrained advantage of this free pass to promote their own economic, political, and personal interests.

2. If the residents of this finest city in America were aware of the violations suffered by criminal defendants, upwards of fifty percent of whom are innocent under the law, the public outcry would be immense. But the public is unaware.

3. This Class Action complaint seeks not only redress for the injuries of thousands, and injunction against future violations, but also public awareness and involvement in a problem which requires immediate remedy.

4. This is a civil action seeking monetary damages, restitution, injunction, and declaratory relief against Defendant, County of San Diego, for numerous Civil Rights violations committed by the County and its agents against persons arrested,

incarcerated, subject to probation, and named as defendants in criminal cases,

which violations are continuing and will continue until enjoined.

5.  Plaintiff, Susan Carter, on behalf of herself and the Class, brings this action

against Defendant, which wrongfully prosecuted and incarcerated Plaintiff and

members of the Class in violation of their civil rights under the First, Fourth,

Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. constitution and

under Federal and State statutory and common law.

6.  Plaintiff and members of the Class are entitled to an injunction against continuing

violations, and an award of compensatory and punitive damages and attorney fees

and costs under the Federal Civil Rights Act (42 U.S.C § 1983); and damages for

supplemental State law claims.


## CLASS ALLEGATIONS


7.  Plaintiff brings this action on behalf of herself and all others similarly situated

pursuant to Fed. R. Civ. P. §23. This action satisfies numerosity; commonality;

typicality; predominance; and superiority requirements of Rule 23.

8.  The proposed class is defined as follows:

All individuals who, within the applicable statute of limitations preceding the

filing of this action to the date of class certification, have been named as a

criminal defendant in San Diego County State Courts (excluding any Federal

Court defendants prosecuted under Federal jurisdiction in San Diego) and who

have suffered any of the Federal Constitutional violations referenced in this

Complaint as a result of their status and involvement as a criminal defendant
in San Diego courts.

9.  Plaintiff reserves the right to modify or amend the definition of the proposed
    Class before the Court determines that certification is appropriate.

10. Excluded from the class are all employees of San Diego County; all proposed
    members who make a timely election to be excluded; governmental entities; and
    judges assigned to hear any aspect of this litigation, as well as their immediate
    family members.

11. The members of the Class are so numerous that joinder is impractical. The Class
    consists of thousands of members, the identity of whom is within the knowledge
    of and can be ascertained by resort to San Diego criminal court records.

12. The claims of the representative Plaintiff are typical of the claims of the Class in
    that the representative Plaintiff suffered the Constitutional violations complained
    of herein at the hands of Defendant, as a result of its various unconstitutional
    policies, practices and procedures as set forth herein. The representative Plaintiff,
    like the members of the Class, has been damaged by Defendant's misconduct and
    continues to suffer damages as a result of this conduct.

13. In addition, rule 23 (b) (1) (8) permits class certification because the prosecution
    of separate actions by individual class members would create the risk of
    adjudications which as a practical matter would be dispositive of the interests of
    other class members not bringing this lawsuit. Also, rule 23 (b) (2) permits class
    certification because the County of San Diego has acted or has refused to act on
    grounds generally applicable to the class of criminal defendants prosecuted by the

4

County. As a result, final injunctive relief and corresponding declaratory relief for the entire class would be appropriate.

14. The factual basis of Defendant's misconduct is common to all Class members, and represents a common thread of illegal, unfair and unconscionable conduct resulting in injury to all members of the Class.

15. There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

16. Among the questions of law and fact common to the Classes are whether the County of San Diego committed:

      a. Police brutality toward arrestees and other individuals;

      b. Illegal investigations by county officers;

      c. Illegal searches and seizures;

      d. Theft of property of criminal defendants by police officers and other officials;

      e. Wrongful issuance of arrest warrants;

      f. False and wrongful arrest;

      g. Wrongful incarceration;

      h. Wrongful denial of bail in direct violation of the Bill of Rights and of Article I, §12 of the California Constitution;

      i. Illegal activities by probation officers in "setting up" probationers to fail on probation in order to achieve arrests, incarceration and convictions.

      j. Imposition of false and unsupportable charges against criminal defendants;

      k.  Doctoring and falsifying discovery documents in order to garner convictions;

      l.  Illegal denial of custody credits to incarcerated persons, by utilizing the "controlling case" limitation, which is directly contrary to statutory law;

      m.  Forced plea bargains; and

      n.  Subjection of arrestees and incarcerated persons to degrading, unsafe and inhuman conditions; embarrassment and ridicule; and unfair and discriminatory treatment.

17. Other questions of law and fact common to Plaintiff and other members of the Class include:

      a.  The proper method or methods by which to measure damages; and

      b.  The declaratory relief to which the Class is entitled.

18. Plaintiff's claims are typical of the claims of the other Class members, in that they arise out of the same wrongful Constitutional violations committed upon criminal defendants in San Diego County.   Plaintiff has suffered the harm alleged and has no interest antagonistic to the interests of any other Class member.

19. Plaintiff is committed to the vigorous prosecution of this action and is working through a non-profit law firm with interest in, and experience in, civil rights actions and in particular, the prosecution of class action suits.  Accordingly, Plaintiff is an adequate and dedicated representative and will fairly and vigorously protect the interests of the Class.

20.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Every member of the class is uniformly subject to the violations alleged herein, as each is subject to the wrongful policies,

processes and procedures employed by the County in administration of their

Courts, jails, probation departments, and police and sheriff departments.

21.  No class member can afford to seek legal redress individually for the claims

alleged herein.  Given the complex legal and factual issues involved,

individualized litigation would significantly increase the delay and expense to all

parties and to the Court.  Individualized litigation would also create the potential

for duplicative or contradictory rulings. By contrast, a class action presents far

fewer management difficulties, allows claims to be heard which might otherwise

go unheard because of the expense of bringing individual lawsuits, and provides

the benefits of adjudication, economy of scale, and comprehensive adjudication

by a single court.

## JURISDICTION

22. This Complaint is brought in Federal District Court pursuant to 42 U.S.C. §1983.  The

court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (Federal Question) and

§ 1343 (3) and (4) (Civil Rights).

23. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§

2201-2202 and Fed. R.Civ.P.57.

## VENUE

24. Venue is proper in the United States District Court for the Southern District of California

under 28 U.S.C. § 1391(b) as Defendant resides in and does business in the Southern

District of California.  This also is the jurisdictional district in which the events or

omissions giving rise to the claims alleged herein occurred.

25. Under 28 USC § 1367(a) the Court has supplemental jurisdiction over any state claims

alleged herein.


## PARTIES

26. Plaintiff is an individual and a U.S. citizen, previously residing in San Diego County,

California, and currently residing in Contra Costa County, California.  Plaintiff has

personal knowledge of the facts stated in this Complaint.  Plaintiff has been subject to

police brutality and harassment; theft of her personal property by County officials;

wrongful arrest and incarceration; illegal denial of bail; imposition of false and

unsupportable charges against her; falsification of her discovery documents; illegal denial

of custody credits; coerced plea bargains; illegal and unconscionable actions of probation

officers in attempting to prosecute her; and inhumane treatment, including withholding of

medical attention and elder abuse.

27. Defendant, San Diego County, is a public entity operating as a County Government.

Defendant, San Diego County was in fact at all times, operating and acting under the

authority or color of state law at the time these claims occurred in that said Defendant

was acting under color of statutes, ordinances, regulations, policies, customs and usages

of the state of California, San Diego County, and/or the San Diego County Department of

Probation, causing harm to the Plaintiff and to members of the Class, in effecting the

deprivation of their rights.  Defendant, San Diego County, was at all times relevant

herein, the employer of various sheriffs, investigators, probation officers, District

Attorneys and deputy district attorneys, jail staff, and public defenders who are responsible for the acts complained of herein.

28. Defendant, San Diego Department of Probation, is a public agency operating under the aegis of the County of San Diego.  Defendant, San Diego Department of Probation, was in fact at all times, operating and acting under the authority or color of state law at the time these claims occurred in that said Defendant was acting under color of statutes, ordinances, regulations, policies, customs and usages of the state of California, San Diego County, and/or the San Diego County Department of Probation, causing harm to the Plaintiff in effecting the deprivation of her rights. Defendant, San Diego County Department of Probation, was at all times relevant herein, the employer of various probation officers who have committed the violations set forth in this Complaint.

29. Does 1-20 are persons whose capacities are unknown to Plaintiff but who will be named Defendants as soon as their identity is known.  Plaintiff is informed and believes that all persons named herein as Defendants, including Doe Defendants, were at all relevant times herein the agents and employees of other Defendants who were acting in the course and scope of their agency and employment.

## FACTUAL ALLEGATIONS

30. Plaintiff served a 13-month prison sentence in 2010 and 2011 for technical probation violations on two 2009 San Diego cases.  The violations consisted of failing to make restitution payments and missing a probation meeting.  Plaintiff was released from prison on or about September 8, 2011 to non-revocable parole for 12 months.  Non-revocable parole was a system set up by the State of California for low level offenders, in which the

9

parolee has no reporting requirements and cannot be violated unless a new offense is committed.

31. The 2009 San Diego cases were pled as wobblers, so Plaintiff was eligible to have said cases reduced to misdemeanors and expunged upon her release from non-revocable parole.

32. Simultaneously, Plaintiff was on probation on an 11-year-old Orange County case, and the San Diego violations triggered a violation in the Orange County case. On or about October, 2010, Plaintiff filed a demand under Penal Code § 1381 in order to have the sentences in the two cases run concurrently. The Orange County DA agreed to dismiss the 11-year-old case and to run the probation violation case concurrently with the San Diego case.

33. However, upon Plaintiff's release from prison, probation was reinstated in Orange County. Plaintiff is informed and believes and thereon alleges that this was an incorrect result, as Plaintiff already was on non-revocable parole and Plaintiff had already served time on probation for that 10-year-old case, and the 5-year limitation period under California Penal Code §1203.1(a) for reinstating probation had expired.

34. After several months, the probation proceeding was transferred to San Diego as it is the county of Plaintiff's residence.  Plaintiff faithfully attended all scheduled meetings both in Orange County and in San Diego and complied religiously with all terms of probation.

35. Plaintiff met with her San Diego probation officer, Gallon, briefly in May of 2012.  He stated to her at that time that the transfer process from Orange County was not complete and that she would have to wait before a meeting could be set up. Plaintiff telephoned the Probation office on Ohio Street a couple of times to check on the status of her

probation, as she was concerned that there may have been a mailing to a wrong address, and she did not want to miss any meetings.

36. At the time of meeting with Gallon, Plaintiff also told him that she was planning to file a Petition under PC § 1203.3, for the purpose of seeking an order to terminate her probation early.  Plaintiff gave her reasons as follows:

   a. That she was on non-revocable parole and returned to her County of residence, San Diego, as a condition of non-revocable parole, and she had been discharged or was about to be discharged from non-revocable parole;

   b. That the Orange County case was at that time 10 years old, and she previously had served time on probation on that case, in excess of the 5-year limitation;

   c. That the probation violations that sent Plaintiff to prison, and that resulted in probation in Orange County were purely technical violations and were not deliberate on Plaintiff's part, and that Plaintiff had no new cases in either San Diego or Orange County;

   d. That when Plaintiff filed the Penal Code §1381 demand it was her understanding that the prison term she served was for both Counties, as the Orange County DA had agreed to run the Orange County case concurrently with the San Diego cases. Consequently, she should have been released on non-revocable parole on the Orange County case as well.

   e. That Plaintiff was then 64 years old, soon to be a senior citizen of retirement age, and suffered health problems;

   f. That Plaintiff had founded and presently served as Executive Director of a non-profit civil rights and prison advocacy organization; that she wanted to be re-

admitted to the California bar in order to be more effective in this position; and that her San Diego cases were wobblers and could be expunged once her probation in Orange County was terminated, therefore permitting her to reinstate her membership with the State bar;

g. That she wanted to be able to travel and to visit her grandchildren in Europe whom she had seen only once;

h. That although she had made mistakes in the past, she had paid her debt to society and has put her efforts into being a good citizen and helping others; and

i. That Plaintiff's release from probation would clearly serve the interest of justice.

37. Gallon stated that Plaintiff had to wait until her case was transferred to San Diego before she could file a motion under PC § 1203.3. This took several months. Upon the transfer to San Diego, Plaintiff waited another two months before she obtained a probation appointment at the Ohio Street office, which was scheduled, along with an orientation meeting, for August 29, 2012.

38. On or about July 26, 2012, more than a month before the scheduled meeting, Gallon contacted Plaintiff by telephone and told her that she had to be in his office within an hour that morning, to fill out some paperwork because he was going on vacation. At that time Plaintiff's sister, for whom she was caring and for whom she held primary health care Power of Attorney, was terminally ill, and Plaintiff had to take her to a doctor appointment that morning. Gallon told Plaintiff that if she did not immediately come into his office, he would have a warrant put out for her arrest. He did not state any other reasons for calling the last-minute meeting, other than Plaintiff needed to "fill out some papers."

39. Plaintiff explained the situation concerning her sister to Gallon, and offered to fill out paperwork by fax, and reminded him that she already had an appointment with probation scheduled in late August. Gallon refused to listen to Plaintiff's explanation, stated that "this is not negotiable," and hung up the phone on Plaintiff while she was still talking to him.

40. Plaintiff immediately prepared and faxed a letter to Gallon and the head probation officer at the Ohio Street office, explaining why she did not attend the meeting. Plaintiff's sister passed away August 11. About two weeks later Gallon was able to get a judge to issue a warrant for Plaintiff's arrest.

41. Shortly afterward a law enforcement task force showed up at the La Jolla home of Plaintiff's 85-year-old mother, who had just suffered the loss of her youngest daughter and was simultaneously recovering from a difficult surgery. Plaintiff's mother stated that "about 35 police cars were outside the house" and that "police were all over the house and yard" and that it "looked like a murder scene" and that their demeanor was "threatening".

42. Plaintiff's mother further stated that the incident caused her serious emotional upset because it had embarrassed and distressed her in front of her neighbors, and because the police told her that "(Plaintiff) had committed a felony and they would keep coming to look for her until they found her." Plaintiff's mother had lived in the same home in a pristine neighborhood for fifty (50) years and her peace and stability and good relationships with her neighbors in that neighborhood were extremely important to her.

43. The police also came to the San Diego home of Plaintiff's son, who has two young children, and threatened Plaintiff's son in front of his family that they would "keep

coming back until he turned his mother over to law enforcement authorities." This incident caused severe emotional distress and harm to Plaintiff's young grandsons, ages nine (9) and four (4).

44. Because of the arrest warrant, Plaintiff's business colleagues, including those who worked with Plaintiff for the Foundation for Inmate Advocacy, no longer felt comfortable doing business with Plaintiff and refused to work with her or associate with her. Prospective clients declined to utilize Plaintiff's services because they feared she would go to jail and not be able to handle their case. Employees, including attorneys, quit their jobs because they did not want to associate with Plaintiff any longer and were concerned that they would not be paid.

45. In several cases, in which Plaintiff and her staff already had prepared and filed well researched and well-written Petitions for Writs of Habeas Corpus on behalf of imprisoned clients, the clients and their families have pulled the files from Plaintiff's organization and have turned over the cases to other attorneys, on account of their discovering that Plaintiff was "wanted by the authorities for committing a felony."

46. The arrest warrant caused Plaintiff to have to delay her application and testing for readmission to the California State Bar.

47. The arrest warrant caused Plaintiff to have to withdraw her applications for graduate school, which is very important to her, and to which she may never have another chance to apply due to her age. Plaintiff would like to obtain a doctorate degree in Constitutional Law so that she can teach and write at the law school level on the subject of Criminal Writs and Appeals and Constitutional Law. A business colleague, who had written a letter of reference on behalf of Plaintiff for admission to the Yale University PhD

program in law, withdrew her recommendation upon learning about the arrest warrant, causing Plaintiff significant distress and embarrassment.

48. Plaintiff was informed by the Social Security Administration that she will lose her Social Security benefits if she is arrested, which will result in severe financial hardship to Plaintiff. She was also informed that she may no longer be eligible for Medicare, leaving her without a source of insurance except Supplemental insurance, which will not cover Plaintiff except in connection with Medicare. Plaintiff suffers from arterial blockage and must be under physician's care for her condition.

49. Plaintiff called the probation office on May 29, which was the date of the originally scheduled meeting, and spoke to probation officer Wright, who informed her that her probation had been revoked and that Gallon was no longer her probation officer, and that Gallon no longer worked in the Ohio Street office.

50. Plaintiff is informed and believes and thereon alleges that the probation appointment requested by Probation Officer Gallon was a "set-up" and that there was no urgent reason for Plaintiff to come in on that date, and the business could have been completed by another means or at the date of the upcoming August meeting.

51. Plaintiff is informed and believes and thereon alleges that the sole motive of Defendants was to prosecute Plaintiff, and, as a result, to harass, annoy, threaten and cause serious financial and personal harm to Plaintiff, all for the purposes of their own financial and political gain.

52. Plaintiff had committed no new crimes and had fully served her sentence for her past crimes. Plaintiff was released from non-revocable parole four (4) months early, and received her "Certificate of Discharge" from non-revocable parole on or about May 1,

15

2012.  The Certificate states that "(Plaintiff) has been discharged from the jurisdiction of

the California Department of Corrections and Rehabilitation on all existing felony

commitments as of this date."

53. There was no probable cause for Plaintiff's arrest, nor would Plaintiff's arrest have

    served any legitimate law enforcement purpose

54. Plaintiff filed a claim against Defendants for her damages on or about December 6, 2012.

    Shortly afterwards she received a letter from the San Diego County Department of

    Probation, by Probation Officer Mack Jenkins, stating that the Department of Probation

    had received her claim, and that, essentially, Gallon's actions had been ratified by his

    supervisor and that Plaintiff's claims were unfounded, and that Plaintiff should turn

    herself in.

55. Plaintiff wrote a response to said letter stating, essentially, that she was amenable to the

    settlement of the case, however, any settlement terms would have to include the recall of

    the warrant.

56. On or about March 7, 2013, Plaintiff was arrested at her home by three Marshalls who

    pointed two machine guns at her head, and she transported to San Diego County jail.  She

    was initially taken to the facility in Vista, which did not provide accommodations for

    women. Consequently, she and 6 or 7 other arrestees were required to remain in an

    unheated room with no furniture whatsoever, other than a toilet, for over 24 hours until a

    bus came to take them to Las Colinas jail.

57. The women were required to spend the night on a concrete floor with no blankets or

    additional clothing provided.  The women removed their socks from their cold feet and

    rolled them up to make pillows.  Because of Plaintiff's back condition, she was unable to

get up from the floor to use the toilet all night, because she did not want to awaken the other women to help her get up. No medication was administered to her, and she caught a bad cold from freezing and shivering all night.

58. Because of San Diego County's policy, practice and procedure of denying bail to anyone who is suspected of committing a probation violation, even one as negligible as failing to attend a probation meeting, Plaintiff was held in jail without bail.

59. On the day she was arrested Plaintiff had been staying home from work because she had severe back pain caused by sciatica and scoliosis. She remained in jail for two weeks without medical care for her back condition, nor did she receive any medication whatsoever, although she informed the medical staff upon her arrival at jail that she had a cardiovascular condition and had to take medication.

60. At her hearing date, Plaintiff chose to settle her case in order to mitigate her damages. Her only other option, given the "no bail" policy, was to remain incarcerated for another month to attend another hearing. She was offered by the probation department a 360 day sentence (for not attending a probation meeting for which she had a valid, legal excuse!) and settled her case for a sentence of 180 days, which she knew would be served at 50%. Eventually, due to jail overcrowding, Plaintiff eventually was able to be released to a work furlough program so that she could go back to work. However, she served seven weeks in jail as a result of the missed probation meeting.

61. Due to jail overcrowding, there was significantly inadequate medical care for county inmates. Plaintiff was then 65 years old and was covered outside of jail by Medicare and supplemental insurance, which provides excellent care. During her seven weeks in jail,

she only saw a physician once, and never received medication except on a "one time" basis.

62. During this period Plaintiff wrote numerous complaints and "grievances" to the medical staff, including one to the commanding officer of the jail, stating that someone was going to die if the level of medical care was not improved.  She never received a response, except one which stated that "medical staff can only see 20 patients a day, so you'll have to be patient."

## UNCONSTITUTIONAL POLICIES AND PRACTICES OF THE COUNTY OF SAN DIEGO

63. It is the policy, custom and practice of persons employed by the San Diego County criminal courts and criminal systems to place the garnering of arrests and convictions, and the incarceration of individuals, above all other considerations.  There are significant financial, personal and political incentives to engage in these practices which will achieve an arrest, conviction, and/or incarceration.  These policies, customs, and practices are in violation of the First, Fourth, Fifth, Sixth, and Eighth Amendments to the U.S. Constitution, as well as in violation of several provisions of local statutory and case law.

64. The policies, customs and practices of the County of San Diego and its agents and employees cause  significant harm to those affected, including loss of freedom; loss of livelihood; loss of property; damage to reputation; physical, mental and emotional distress; and loss of dignity and self-respect.

A.     **Denial of Bail to Technical Probation Violators: "Incarceration Without Conviction"**

65. It is the policy, practice and custom of San Diego County to incarcerate, without bail, technical probation violators (those who have not committed new crimes, but have only missed probation meetings; missed classes; failed to complete certain educational requirements; or been unable to meet financial obligations). This policy is a violation of the probationer's Due Process rights under the Fifth and Sixth Amendments and of his right to Equal Protection under the Fourteenth Amendment of the U.S. Constitution.

66. Defendants in the San Diego justice system are systematically denied bail if they have violated parole or probation terms. This is a routine practice of judges who issue bench warrants and of arraignment judges.

67. In virtually 100% of cases, persons who are arrested for probation violations, regardless of the nature of their violation or of the underlying crime, are denied bail for the duration of their case, however long. That means that someone who has not committed a crime, but has only committed a technical probation violation, can languish in jail for as long as a year, or longer, depending upon how their case ultimately is disposed of.

68. This policy, practice, and custom of Defendant is illegal. It violates U.S. Constitutional provisions and State Constitutional provisions, as well as numerous provisions of state statutory and case law. The relevant provisions are as follows:

   a.   California Constitution. Art. I, § 12: "A person shall be released on bail by sufficient sureties, except for: (a) Capital crimes when the facts are evident or the presumption great; (b) Felony offenses involving acts of violence on another person . . . and the court finds based upon clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others; or (c) Felony offenses when . . . the person has threatened another with great bodily harm and that there is a

substantial likelihood that the person would carry out the threat if released. . . Excessive bail may not be required. In fixing the amount of bail, the court shall take into consideration the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of his or her appearing at the trial or hearing of the case.  A person may be released on his or her own recognizance in the court's discretion.

b.  The Fifth Amendment to the US Constitution, which provides that "no person . . . shall be deprived of . . . liberty, without due process of law" and the Eighth Amendment to the US Constitution, which states that "Excessive bail shall not be required."

c.  The Universal Declaration of Human Rights, enacted in 1948 by the General Assembly of the United Nations, provides that "Everyone charged with a penal offence (sic) has the right to be presumed innocent until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defence (sic)."

69. The above provisions make the San Diego County policy, custom, and practice of denial of bail to a non-violent offender insupportable under the law.

70. Wrongful denial of bail results in wrongful incarceration, in other words, "incarceration without conviction." Under this policy, procedure and practice of defendant San Diego County, a very large number of those accused of non-violent crimes in San Diego must defend their cases from jail. This produces the ironic result that persons are serving time in jail, yet have never been convicted of a crime.

71. Court and jail statistics show that well over 50% of non-sentenced inmates presently incarcerated in San Diego are subject to some sort of hold which prevents them from posting bail.  The non-local holds, such as Federal holds, out of state holds, and immigration holds, over which San Diego judges typically have no control, comprise only 25% of all holds.  The remaining holds are placed by local judges, typically against non-violent technical probation violators.

72. Jails and prisons are overcrowded. Since the enactment in 2011 of California AB 109, known as "sentencing realignment," which is designed to reduce prison overcrowding by diverting certain prison inmates to County jails, County jails have been pushed to the limit. The counties have had to cut services and programs in order to meet the influx of new inmates. The practice of incarcerating, without bail, technical probation violators is not only a primary cause of jail and prison overcrowding, but also presents severe consequences to the incarcerated person.

73. Table 1, below represents a statistical snapshot of two housing units in two separate San Diego jail facilities in late 2009. The statistics show that in 2009, the majority of inmates residing in local detention facilities had not been sentenced to a crime. It also shows that the majority of them are unable to post bail, due either to holds or to excessive bail amounts. It also is evident that there is not a significant difference in the ability of a defendant who has been accused of a violent crime, and one accused of a non-violent crime, to orchestrate his release from jail.

74. These statistics would become different two years later, due to the enactment of AB 109. After AB 109, the statistical chart would show a much higher percentage of convicted as opposed to non-convicted inmates, due to the large influx of State prisoners into County facilities. However, the number of non-convicted inmates (those who have not yet been tried or convicted) would remain constant, due to the continuing practice of denying bail to probation violators.

\

\

\

21

**TABLE 1**

| INMATE CLASSIFICATION | HIGH SECURITY HOUSING | LOW SECURITY HOUSING |
|---|---|---|
| **TOTAL INMATES** | 142 | 129 |
| **Sentenced Inmates** | 29 | 34 |
| **Non-Sentenced Inmates** | 113 | 95 |
| **CRIMES** | 142 | 129 |
| **Financial** | 39 | 40 |
| **Drug-related** | 98 | 85 |
| **Injury/Death/Assault** | 3 | 0 |
| **Other** | 2 | 4 |
| **HOLDS** | 83 (58%) | 74 (57%) |
| **Local** | 61 | 56 |
| **Non-Local** | 22 | 18 |
| **AVERAGE TIME IN JAIL** | | |
| **BEFORE SENTENCING** | 3.5 Months | 4.8 Months |
| **BAIL AMOUNT RANGE** | 30,000 – 1.5 Million | 7500 – 80,000 |

75. States other than California have liberal release policies in force.  Liberal release policies
are important to societal welfare, as they conform to State and Federal Constitutional
standards.   Furthermore, studies show that American counties that have liberal pre-trial
release policies, have far fewer problems with jail and prison overcrowding, and have a
much fairer trial process due to the absence of bias against the incarcerated defendant,

and also due to the fact that the defendant who is free on bail or on his own recognizance is able to work and able to participate in a more meaningful way in his own defense.

76. Table 2, and Table 3, below, demonstrate the policies in force in New Haven, Connecticut, where it is the objective of County courts to release virtually all non-violent arrestees as soon as possible:

**TABLE 2**

| Condition Immediately Prior to Disposition | Number | Percentage |
|---|---|---|
| Released on Citation | 244 | 16% |
| Released on PTA (promise to appear) | 565 | 36% |
| Released on bond | 237 | 37% |
| Subtotal Released | 1376 | 89% |
| Detained | 166 | 11% |
| TOTAL | 1542 | 100% |

/

/

/

/

/

/

/

Thus, a statistical chart showing the amount of time typically spent in pre-trial detention would look like this:

**TABLE 3**

| Length of Time | N | % |
|----------------|-----|-----|
| None | 244 | 17% |
| 0-3 Hours | 624 | 43% |
| 4-7 Hours | 82 | 6% |
| 8-12 Hours | 92 | 6% |
| 13-24 Hours | 308 | 21% |
| 2 Days | 31 | 2% |
| 3 Days | 10 | 1 % |
| 4-7 Days | 12 | 1% |
| 8-20 Days | 18 | 1% |
| Over 20 Days | 17 | 1% |
| TOTAL | 1438 | 99% |

Tables 2 and 3 are courtesy of Malcolm Feeley, *The Process is the Punishment,* Russell Sage Foundation, New York 1992, pages 202-203.

77. When comparing the pre-trial release procedures in San Diego County, California and New Haven County, Connecticut it is relevant to note that both States have similar bail statutes.

78. When jail and prison overcrowding became a significant issue in San Diego County in 2010, all possible options to alleviate such crowding were explored, except for the most likely one, which is to grant bail to non-violent offenders.

79. The incarceration experience severely affects the outcome of the case. Those present in the courtroom see the defendant in jail uniform, usually in handcuffs and chains. It sends an inflammatory message to everyone, including the jury and often the judge. The message states that this person must be *a dangerous criminal,* or why would he or she be *chained?*

80. Incarceration also deprives the defendant of a livelihood, which factors significantly into his ability to hire a competent attorney. It deprives him of access to resources necessary to defend the case. (Lack of state and county funding has literally shut down jail and prison law libraries). And incarceration is highly defamatory to the innocent or non-violent defendant: everyone wears the same uniform and the same amount of metal, regardless of the seriousness of the crime, or whether a crime has been committed at all.

81. Defendants who are held in custody until disposition of their cases are at a special disadvantage. Research has consistently shown that those unable to post bail are more likely to be convicted than those who have been released prior to trial, and if convicted they are more likely to receive harsher sentences.

82. The policy, practice and procedure of denying bail to technical probation violators also constitutes Double Jeopardy in violation of the Fifth Amendment, as well as a violation of California Penal Code § 654, which disallows consecutive sentences for the same crime.

83. In a typical such case, a defendant pleads guilty to a crime, negotiates a plea bargain, and serves his sentence or is released on "time served" to probation. Under the terms of the plea bargain, he agrees that if he commits another crime, he will receive a stiffer sentence, usually prison. What the fine print in the plea agreement does not tell him is that if he commits a technical probation violation, such as failing to show up for a meeting with the probation officer, or missing a domestic violence class, or missing a restitution payment, he has violated probation within the meaning of the plea agreement, and can receive a prison sentence for this technical violation, even if no new crime has been committed. Consequently, he is punished twice for the original crime.

### B.    False Charges to Increase Jail Time and Conviction Rates

84. It is the policy, custom and practice of San Diego County prosecutors to file new charges against someone who has been arrested for a technical probation violation, whether or not there is any evidence of criminal behavior. This policy, custom and practice is intended to increase the number of days that the person spends incarcerated. It also increases the leverage that the District Attorney will have to achieve a conviction by plea bargain.

85. Because the probation violator is being held without bail due to the technical probation violation, a hold is placed on the inmate whether or not the new charges are bailable offenses. The defendant will therefore be unable to post bail, and will remain in custody until the new cases are completed. The incarcerated person must not only answer to the probation violation, but must proceed through all the stages of procedure for the new charges or charge, including arraignment; preliminary hearing; various evaluations by

26

psychologists and social workers; readiness conference; pretrial conference; and ultimate disposition.

86. This generally results in at least a three to four month incarceration period, at the end of which the defendant will either go to trial or enter into a plea agreement. Generally, the false charges will be dropped; and the defendant will be sentenced to "time served" and can be released upon entering into the agreement.

87. By this time, the defendant, who has committed only a technical probation violation, and is most likely an employed person or business owner who has missed valuable time at work, or who may be a parent whose children are spending time under someone else's care, or may be a person who has an illness and needs better medical care than he is receiving in jail, has no choice but to accept the plea agreement.

88. San Diego defendants spend considerable time in jail due to false charges. While in the civil system attorneys can be sanctioned for bringing false claims or complaints, in the criminal system there is no such deterrent, and any prosecutor is free to fabricate a charge that will land a person in jail and keep him or her there for long stretches of time.

89. Statistics show that nearly 32% of all charges are dismissed by the court prior to the resolution of a case, but not before such charges have brought significant emotional and financial hardship to the accused. For example, it is common for an accused to spend non-refundable money on bail and on attorney fees, on account of dismissible, and soon to be dismissed, charges.

90. Even after being dismissed, false charges do not disappear from the individual's record without considerable legal and political effort. Such charges can be used to give a person

a "prior record" even after their dismissal, leading to more serious charges and longer

sentences should the accused be involved in the criminal system again.

91. It is also a common practice for San Diego prosecutors to either tamper with, withhold or

remove exculpatory evidence from discovery presented to the defendant, defense counsel,

and the court before the preliminary hearing. This is called a "Brady" violation, and it

typically cannot be addressed on direct appeal because it doesn't form a part of the

Court's trial record.

92. For example, contractual evidence which forms part of the prosecutor's "discovery,"

with pages missing from the contract that would have provided a defense, would be

presented to a defendant for review. The defendant, noticing the missing pages, would

ask his defense counsel to provide the rest of the document, and the defense counsel

would say it cannot be done, or simply cover up for the prosecutor.

93. Also relevant are the policies, practices and customs of denying inmates "custody

credits" for time they have spent in jail on the same case or on a related case. California

Penal Code §4019 provides that the inmate will receive a credit of an extra day for every

two days served, unless that inmate has committed a violent or serious felony, or is

required to register as a sex offender. However, it is the policy and procedure of the

courts to curtail those credits so that when a person has served consecutive time on two or

more cases, only what is called the "controlling case" can be taken into account in

computing credits.

94. There is no mention in the California Penal Code of a "controlling case." It is mentioned

in a State of California internal policy manual, which is used by courts to extend the

inmate's sentence by denying credits. Sometimes under this policy an inmate can lose

hundreds of days of credit. When persons subject to this rule try to appeal or otherwise challenge the denial of credits, their case is largely ignored.

### C. Forcing Plea Bargains

95. It is the policy, practice and procedure in San Diego to dispose of as many cases as possible by plea bargain. The plea bargain is a political tool, as well as a way of disposing of cases and gaining convictions as quickly and easily as possible.

96. Consequently, it is common policy, practice and procedure in San Diego County to illegally coerce a defendant into accepting a plea bargain. Very often the defendant is lied to as to the consequences of *not* accepting the plea deal.

97. A common, and illegal ruse, is perpetrated by the attorney who says to his or her client: "If you don't take this deal, you are going to prison." Another illegal tactic is to tell the defendant that "You need to decide right now (without the opportunity to think about it or consult with family or other advisors), or the deal is off the table." Some judges will even refuse to try certain cases, even if the defendant wants to exercise his right to go to trial, and will insist upon "settlement."

98. It is well settled law that a plea bargain must be knowingly and voluntarily agreed to by the defendant. However, once a defendant is forced to agree to a plea bargain that he does not want to enter into, and even if he is completely innocent of the charge, the frivolous charge becomes a real conviction. There are many individuals in San Diego with the words "convicted felon" after their names, as a result of invalid charges to which the defendant is coerced into plead guilty.

### D.   The Probation Paradox

99.   It is the practice, policy and procedure of the San Diego County probation department to set up probationers to fail in probation, so the probation officers can illegally prosecute and incarcerate them.

100.   There is financial and often political incentive for San Diego county officials to "set up" criminal defendants to fail on probation, for the purpose of achieving a warrant and an arrest. For this reason, it is common policy, practice and procedure for probation officers to fabricate reasons to bring probationers into their offices and arrest them on the spot; or to have a judge issue a warrant without any probable cause or reason.

101.   There are many legally recognized excuses for a probationer to commit a minor, technical violation.  However, probation officers have free reign to not recognize those excuses, and to have a warrant issued against a probationer at any time they desire; they do not need to present any kind of a case to the judge.  San Diego County judges will issue a warrant against a probationer *ex parte* and without any proof that the probationer has committed a violation, other than the word of probation officer.

102.   It is well established in California that the purpose of probation is rehabilitation. Probation is granted to the end that a defendant may rehabilitate himself, make a responsible citizen out of himself and be obedient to the law.  A probation condition imposed by the court or by a probation officer is invalid if it: (1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct that is not in itself criminal, and (3)  relates to conduct that is not reasonably related to future criminality.

But it is the policy, custom and procedure of probation officers to do very little, and

sometimes absolutely nothing, to rehabilitate probationers and to help make them

productive members of society. Furthermore, invalid and illegal probation conditions are

consistently imposed by probation officers, as well as by courts, with impunity.

103.    Since probation is an expensive service paid for by County taxpayers, such taxpayers

would be appalled to learn that the probation process is not used for rehabilitation and

reform, but simply as an arm of the prosecution, and as a means of achieving arrests,

convictions, and incarceration.

### C.  **Political Benefits of Constitutional Violations**

104.    Conviction rates are highly important not only to the county employees who are

compensated for each conviction they are able to achieve, but also to those politicians

who base their platform on the percentage of "convictions" they are able to earn.

105.    Bonnie Dumanis, three-term elected District Attorney in San Diego from 2003 to the

present, claimed during her second bid for D.A. to have achieved a "94% conviction rate"

in her first term in office. This made her popular among her constituents, who believed

her numbers indicated a dropping crime rate.

106.    However, what actually occurred was an unprecedented number of plea bargains

during her term. Nationally, statistics show that at the present time, ninety-seven percent

of Federal convictions and ninety-four percent of state convictions are the result of plea

bargains.

107.  Due to the policies, practice and customs of San Diego County in emphasizing the plea bargain as the preferred means of settling cases, and utilizing almost any means to achieve that policy and prevent defendants from going to trial, there is concern that sparse county resources are being misdirected. The fact that John Gardner III, a known sex offender and parolee, was able to murder two San Diego teenagers a year apart is testimony to County misappropriation of resources.

55.  Gardner's Mira Mesa residence was located within 125.5 yards of the child development center for ages 2-5 at Miramar College. Also located in the surrounding area was Scripps High School within 356.2 yards and San Diego County Regional Park (Hourglass Park) within 478.8 yards.

56.  The California Department of Corrections and Rehabilitation ordered Gardner to be monitored via GPS from Sept. 25, 2007 through Sept. 26, 2008. 14-year-old Amber Dubois went missing Feb. 13, 2009. She disappeared four months after Gardner's GPS monitoring expired.

57.  Gardner was released from GPS monitoring on Sept. 26, 2008, but the parole officer recommended continued parole. The parole report states: "Retain on parole as subject has had periods of instability. Continued structure and supervision is warranted for community protection."

58.  However, Gardner went unsupervised not only to commit the rape and murder of Amber, but to commit the rape and murder of Chelsea King on February 25, 2010, an entire year later. During those years, while Bonnie Dumanis held the office of District Attorney in San Diego County, she was able to tout her conviction rate at 94%, as a result of thousands of defendants, many of them literally innocent, entering into guilty pleas. Yet,

Dumanis led the San Diego public to believe, by implication, that a 94% conviction rate meant that San Diego's streets were almost 100% safe.

59. Although Gardiner was on State parole, he committed both murders within San Diego County jurisdiction. Although there has been significant debate over whether a more thorough investigation by San Diego County into Amber's disappearance may have prevented Chelsea's death, it is obvious that any County which directs its resources toward the incarceration and conviction of those who are innocent or who have committed minor violations, rather than investigating murders, is misdirecting its resources. This misdirection is certain to result in severe impact on those the system is intended to protect.

60. Significant leverage is afforded by incarceration. The "no bail hold" operates as a powerful lever for prosecutors to bolster the conviction rate. Because of the serious financial and emotional implications of incarceration, not to mention the difficulty of waging an adequate defense while incarcerated, the plea bargain is seen by inmates as their only alternative.

### E. Police Harassment and Brutality

61. To the end of achieving an arrest or other personal gain, San Diego County Sheriffs and investigators regularly and systematically brutalize, harass, defame, steal from, and lie to arrestees and intended arrestees. They have beat up arrestees for failing to submit to arrest; have arrested citizens for minor and technical probation violations at

gunpoint; and they were observed holding a gun to the head of an 87-year-old woman while attempting to arrest her daughter.

62. They illegally enter a person's residence without a search warrant for the purposes of making arrests, and then remove property such as laptop computers from the residence, presumably for "evidence," yet fail to turn over the "evidence" to the District Attorney. The property will seldom be returned, even if the owner files the appropriate motions with the court, seeking the return of the property.

63. They have ordered cash to be turned over by arrestees, falsely claiming they needed the cash for "restitution."

64. They have brutalized not only arrestees and intended arrestees, but have tasered and kicked pet cats and dogs, in order to get persons to submit to arrest.

65. They have gone to homes of family members of persons who have arrest warrants for minor and technical probation violations, and have defamed those persons in front of family members, including elderly people and young children, by implying that their family member committed serious or violent crimes. Often they show up at those homes in large force, regardless of the seriousness of the crime, in order to create a frightening, "crime scene" effect to frighten and embarrass the family members or friends.

66. They force arrestees to ride in patrol cars without seat belts, and refuse water to an arrestee who is choking, coughing, elderly, or seriously ill or injured. Their brutality towards arrestees and intended arrestees is uniform, regardless of the age or physical condition of the arrestee; or the seriousness of the crime suspected or charged

### F.    Inhumane Treatment of Incarcerated Persons

67. The jail experience in San Diego County is horrific.  When an incarcerated person has to attend a court appearance, he is awakened at 4:00 a.m. and is chained painfully to two or three other inmates at the wrist and about the waist to go on what may be as long as a two-hour bus ride; once he arrives in court he is paraded, still in chains, and forced to march two or three abreast down crowded hallways of a public building, where he is subject to stares and ridicule and is sometimes even spat upon.

68. After reaching the courtroom, incarcerated persons are stuffed like cattle into small cages, very much like dungeons, where they often spend as long as twelve hours, in freezing, stark rooms on cement floors or metal benches, with no place to sit unless they choose to lie down on a dirty, cold cement floors, and without any access to reading or writing material.  There is one toilet in the middle of the cage; and there is usually no toilet paper and no water.  If someone gets sick while in those conditions, they are usually ignored by the court deputies, and even requests for drinking water are refused.

69. Inmates are often subject to a "dry run," in which they are hustled out of bed at 4:00 am, chained together to take the bus trip to court, and made to sit in the freezing court's dungeon all day, waiting for a court hearing that never takes place. These "dry runs" are not a scheduling mistake; they are a deliberate means of increasing transportation revenue and extending incarceration periods. A typical hearing postponement period after a "dry run" is one month.

70. Most of these detainees are non-violent probation violators.  Many are parents of young children.  Often they are women who are weeks, days, even hours from giving

birth, who must suffer the birth experience in wrist and ankle chains. Or they are women only hours post-partum, whose newborns are taken from them and placed in county shelters.

71. Many are drug addicts who belong instead in hospitals and treatment centers. They are cancer patients: one woman recently succumbed to Stage IV cancer only two months after her release from Las Colinas Detention Facility in Santee. They are mental patients whose diseases are not being treated in jail.

72. Medical conditions are largely ignored in jail. The elderly, the sick, and the handicapped are treated the same as the healthy person. Recently, due to jail overcrowding, medical treatment has been severely curtailed. A person who suffers a heart attack in jail, or any other life-threatening, sudden-onset condition, will not receive life-saving treatment in time to save his life. Many persons die in jail. The cause of the high mortality rate is not simply the lack of medical staff, it is also the that the staff does not take seriously the inmate's symptoms, or is not qualified to make correct diagnoses, or, worse, simply does not care because the person is thought of as a criminal.

## CLAIMS

73. Paragraphs 1 through 72 are incorporated by reference as if set forth here.

74. As a direct and proximate result of the unlawful conduct of Defendants, and each of them, in denying members of the Plaintiff class bail; subjecting members of the Plaintiff class to false arrest and false incarceration; illegal activities by probation

officers in "setting up" members of the Plaintiff class for arrest and incarceration; levying false charges against members of the Plaintiff class; forcing members of the Plaintiff class into illegal plea bargains; committing theft of property of the Plaintiff class; falsifying documents and intentionally committing "Brady" violations against members of the Plaintiff class; the members of the Plaintiff class have suffered civil rights violations under the First, Fourth, Fifth, Sixth, and Eighth Amendments to the U.S. Constitution; suffered financial damages; suffered severe emotional distress, has suffered loss and alienation of family, friends and business colleagues, and has been demeaned, embarrassed, defamed, and discredited by false and malicious prosecution and arrest; suffered inhumane, undignified, painful and unconstitutional treatment; and has further been harmed in that it was threatened by Defendants with and subject to loss of liberty, peace, comfort and safety.

75. WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

   a. Entry of a declaratory judgment that the conduct committed against the Plaintiff class by defendants constitute violations of the First, Fourth, Fifth, Sixth, and Eighth Amendments to the U.S. Constitution;

   b. Entry of a permanent injunction to prevent and enjoin Defendants from committing such violation in the future;

   c. Compensatory damages against the Defendants for violations of Federal rights pursuant to 42 U.S.C. § 1983 in an amount appropriate to the proof adduced at trial;

   d. Punitive damages against Defendants;

e.   An award of Plaintiff's reasonable attorney fees, expenses and costs pursuant to 42 U.S.C. § 1988 and any other applicable statute or rule of law; and

f.   Such other and further relief, including all appropriate equitable relief that the Court may deem just and proper.

PLAINTIFFS DEMAND A JURY TRIAL AS TO ALL ISSUES SO TRIABLE

Dated: June 23, 2014                     Respectfully submitted,

Susan Carter, Plaintiff and Class Representative,
*In Pro Per*
The Foundation for Inmate Advocacy and
FIA Law Advocates, Inc.
3494 Camino Tassajara # 416
Danville CA 94506